## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

TIMOTHY D. THOMAS,

    Plaintiff,

    v.

TIMOTHY D. SCHAEFFER, et al.,

    Defendants.

CIVIL ACTION NO. 3:24-cv-01603

(SAPORITO, J.)

### MEMORANDUM

In this federal civil rights action, brought under 42 U.S.C. § 1983, the plaintiff, Timothy D. Thomas, challenges the constitutionality of a state statute providing waterways conservation officers, at times also known as waterways patrolmen or fish wardens, with broad authority to "enter upon any land or water" to investigate fishing and boating violations, including entry onto private property without a warrant or the property owner's consent.

The statute at issue is a provision within Pennsylvania's Fish and Boat Code, which provides that: "Every waterways conservation officer shall have the power and duty to . . . [e]nter upon any land or water in the performance of their duties." 30 Pa. Cons. Stat. Ann. § 901(a)(7). Thomas contends that the statute is unconstitutional under the Fourth

Amendment's prohibition against unreasonable searches and seizures, both on its face and as applied to the facts alleged in this case.

The plaintiff seeks declaratory and injunctive relief. He does not seek an award of damages. The defendants—Timothy D. Schaeffer, the Executive Director of the Pennsylvania Fish and Boat Commission (the "Commission"), and Ty C. Moon, a Waterways Conservation Officer ("WCO") employed by the Commission—are sued in their official capacities only.

The defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted. Doc. 12. The motion is fully briefed and ripe for decision. *See* Doc. 13; Doc. 20; Doc. 24; Doc. 28; Doc. 29.

## I.    FACTUAL ALLEGATIONS

The plaintiff, Timothy Thomas, lives in a lakeside cabin on Minnow Drive in Susquehanna, Pennsylvania, which he purchased with his late wife, Stephanie, in 2014. After Mrs. Thomas was diagnosed with cancer in 2022, the cabin became a place of respite while she underwent treatment.

The cabin is located in a quiet area at the end of a long dirt road.

The only approach to the cabin's front door is a driveway. Desiring privacy, the Thomases had posted two "no trespassing" signs on the property.

The cabin has a back door that opens onto a porch facing Butler Lake. To reach the backyard, and the back door, a visitor would need to walk to the end of the driveway, past the cabin's front door, past multiple "no trespassing" signs, through a gap between foliage and the side of the cabin, within several feet of the cabin's side windows—including a bathroom window—and up several steps onto the covered back porch.

The property includes frontage on Butler Lake. Mr. Thomas keeps a pontoon boat either in his backyard or moored to a small private dock that sits approximately 75 feet from the cabin, on the opposite side of the backyard. Since acquiring the cabin, Mr. Thomas regularly fishes on Butler Lake from his pontoon boat. Mr. Thomas only fishes recreationally, and he has always done so with a valid fishing license and abiding by all applicable fishing regulations.

On May 13, 2023, Mrs. Thomas was home alone at the cabin when she heard an unknown individual knock loudly at the front door. She did not answer the front door both because she was afraid and because she

was non-ambulatory at that stage in her cancer treatment. Unbeknownst to Mrs. Thomas, the person knocking at the door was WCO Moon. When no one answered at the front door, WCO Moon went around the house as described above and began pounding on the back door. While pounding on the front and back doors of the cabin, WCO Moon yelled "I know you're in there!" and "I'm going to call the police!" Mrs. Thomas did not answer the back door either, for the same reasons. After WCO Moon received no response from within the cabin, he entered the Thomases' backyard and took pictures of their cabin, their automobile, and their boat, which was moored at the private dock about 75 feet from the cabin.

WCO Moon entered onto the Thomases' property that day to search for evidence of potential fishing violations, in exercise of his authority under 30 Pa. Cons. Stat. Ann. § 901(a)(7). He did not have Mr. or Mrs. Thomas's consent to enter and search the property that day, nor did he have a warrant to enter and search the property.

The next day, May 14, 2023, the Thomases were out driving and pulled over to pick flowers from the side of the road. While they were pulled over, WCO Moon stopped his vehicle in front of them, exited his vehicle, and told them that they were the people he had "been chasing"

and that he would "get to the bottom of things." This encounter left the Thomases confused, frustrated, and insulted.

On May 18, 2023, the Thomases received a citation in the mail, which alleged that, on May 15, 2023, Mr. Thomas had eluded an officer while fishing without a license (the "May Citation"). The allegations of the May Citation were false: Mr. Thomas had never attempted to elude an officer, and he had never fished without a license. On June 9, 2023, Mr. Thomas submitted a complaint to the Commission, disputing the allegations of the May Citation and criticizing WCO Moon's conduct. A few days later, Mr. Thomas received a call from Lt. Col. Tom Edwards informing him that the charges of the May Citation would be dismissed. On June 14, 2023, the Court of Common Pleas for Susquehanna County dismissed the charges set forth in the May Citation.

After the events of May 13, 2023, Mr. Thomas installed two additional "no trespassing" signs—one at the entrance to the cabin's driveway and one at the side entrance to the backyard. These "no trespassing" signs were visible from the road.

On August 12, 2023, Mr. Thomas was fishing on Butler Lake from his pontoon boat. At the same time, WCO Moon was watching Mr.

Thomas through a pair of binoculars from the nearby property of a private hunting club. When Mr. Thomas began bringing the pontoon boat back to shore, WCO Moon drove out of the hunting club's property and parked his vehicle about 200 yards down the road from the Thomases' cabin.

WCO Moon approached the cabin from the dirt road, walked to the end of the Thomases' driveway, past the front door, past four "no trespassing" signs, through the gap between foliage and the side of the cabin, and alongside the cabin, passing within three feet—and at eye level—of the bathroom window, shocking Mrs. Thomas, who was taking a bath at the time. WCO Moon continued walking alongside the cabin, crossed the Thomases' backyard, and approached Mr. Thomas, who was standing about 75 feet from the cabin at their private dock.

WCO Moon accused Mr. Thomas of fishing with eight rods, in violation of state law. Mr. Thomas informed WCO Moon that he was trespassing on the Thomases' property and offered to continue the conversation on the road instead. WCO Moon and Mr. Thomas walked out to the road together, where Mr. Thomas complied with WCO Moon's order to provide his driver's license and fishing license. WCO Moon

- 6 -

informed Mr. Thomas that he would be conducting an inspection. Although Mr. Thomas protested, WCO Moon returned to the Thomases' private dock by the same path he had previously taken—past the "no trespassing" signs and the cabin's bathroom window—and then returned to the road. Then, for a third time, WCO Moon entered onto the Thomases' property and walked to the private dock, once again over Mr. Thomas's protests, this time seizing eight of Mr. Thomas's fishing rods.

WCO Moon entered onto the Thomases' property that day to search for evidence of potential fishing violations, in exercise of his authority under 30 Pa. Cons. Stat. Ann. § 901(a)(7). He did not have Mr. or Mrs. Thomas's consent to enter and search the property that day, nor did he have a warrant to enter and search the property.

As a result of this August 12, 2023, entry and search, WCO Moon issued Mr. Thomas a citation for fishing with more than three lines, in violation of 58 Pa. Admin. Code § 63.6(a) (the "August Citation"). The allegations of the August Citation were false: Mr. Thomas owned multiple fishing rods, stored on the deck and in the boat while he fishes, but he had never used more than three lines for fishing. On November 2, 2023, Mr. Thomas appeared *pro se* before a state magisterial district judge and

was convicted of the violation and ordered to pay $354. Mr. Thomas appealed that conviction to the Court of Common Pleas for Susquehanna County, and on June 5, 2024, following a bench trial, Mr. Thomas was found not guilty of the offense charged in the August Citation.

Based on the text of Section 901(a)(7), the Commission's apparent policy to conduct or permit such searches, and the occurrence of these two encounters with WCO Moon, Mr. Thomas alleges that similar searches of his private property will continue to occur in the absence of prospective declaratory and injunctive relief.

## II.   LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). In deciding the motion, the Court may consider the facts alleged

on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Although the Court must accept the fact allegations in the complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)). Nor is it required to credit factual allegations contradicted by indisputably authentic documents on which the complaint relies or matters of public record of which we may take judicial notice. *In re Washington Mut. Inc.*, 741 Fed. App'x 88, 91 n.3 (3d Cir. 2018); *Sourovelis v. City of Philadelphia*, 246 F. Supp. 3d 1058, 1075 (E.D. Pa. 2017); *Banks v. Cnty. of Allegheny*, 568 F. Supp. 2d 579, 588–89 (W.D. Pa. 2008).

## III.  DISCUSSION

The plaintiff brings both facial and as-applied challenges to the constitutionality of Section 901(a)(7) under the Fourth Amendment's prohibition against unreasonable searches and seizures. "The distinction between facial and as-applied challenges goes to the scope of the statute's

claimed constitutional infirmity and the breadth of the remedy sought."
*Green Party of Pa. v. Aichele*, 103 F. Supp. 3d 681, 688 (E.D. Pa. 2015)
(citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331
(2010)).

"A facial attack tests a law's constitutionality based on its text alone
and does not consider the facts or circumstances of a particular case."
*United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) (citing *City
of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 n.11 (1988)).
"[A] plaintiff asserting a facial challenge 'seeks to vindicate not only his
own rights, but those of others who may also be adversely impacted by
the statute in question.'" *Aichele*, 103 F. Supp. 3d at 688 (quoting *City of
Chi. v. Morales*, 527 U.S. 41, 55 n.22 (1999)). "A facial challenge succeeds
only when there is 'no set of circumstances' under which the statute at
issue would be valid—a 'particularly demanding' standard." *Id.* (citing
*Heffner v. Murphy*, 745 F.3d 56, 65 (3d Cir. 2014)) (citation omitted).
"[T]he remedy for a successful facial challenge is the complete
invalidation of a law . . . ." *Id.* at 688 n.4 (citing *Wash. State Grange v.
Wash. State Republican Party*, 552 U.S. 442, 450 (2008)); *see also CMR
D.N. Corp. v. City of Phila.*, 703 F.3d 612, 624 (3d Cir. 2013) ("[F]acial

challenges are disfavored and should be considered sparingly. This is so because facial challenges seek the broad remedy of a complete invalidation of a law and because a ruling on the constitutionality of all possible applications of a statute necessarily rests on speculation and invites the premature interpretation of statutes.") (citing *Wash. State Grange*, 552 U.S. at 450) (citation and internal quotation marks omitted).

"An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *Marcavage*, 609 F.3d at 273 (citing *Wis. Right to Life, Inc. v. FEC*, 546 U.S. 410, 411–12 (2006) (per curiam)); *see also United States v. Mitchell*, 652 F.3d 387, 406 (3d Cir. 2011) (en banc) ("In order to mount a successful as-applied challenge, [a plaintiff] must show that 'under these particular circumstances he was deprived of a constitutional right.") (quoting *Marcavage*, 609 F.3d at 273) (brackets and ellipsis omitted). "Thus, the remedy for an as-applied challenge would be to bar its enforcement against a particular plaintiff alone under narrow circumstances." *Aichele*, 103 F. Supp. 3d at 688 (citing *CMR D.N. Corp.*, 703 F.3d at 624). As the Third Circuit has cautioned, district courts

granting injunctions in such cases "should craft remedies 'no broader than necessary to provide full relief to the aggrieved plaintiff.'" *Belitskus v. Pizzingrilli*, 343 F.3d 632, 649–50 (3d Cir. 2003) (quoting *McLendon v. Continental Can Co.*, 908 F.2d 1171, 1182 (3d Cir. 1990)). For this reason, the "'usual judicial practice' is to address an as-applied challenge before a facial challenge." *Mitchell*, 652 F.3d at 406.

### A. The Plaintiff's As-Applied Challenge to Section 901(a)(7)

In his complaint, the plaintiff contends that application of Section 901(a)(7) under the particular circumstances described above—WCO Moon's entry onto the Thomases' private property to conduct warrantless and nonconsensual searches for evidence of fishing violations on May 13 and August 12, 2023—constituted violations of his Fourth Amendment right to be free from unreasonable searches.

As noted by the plaintiff, the defendants' initial brief did not meaningfully contend that the plaintiff's as-applied challenge should be dismissed. *See* Br. Opp'n 2, 14–15, Doc. 20. Instead, the defendants' initial brief appears to focus exclusively on the plaintiff's facial challenge to the statute. *See* Br. Supp., Doc. 13.

In their reply brief, the defendants have specifically addressed the

plaintiff's as-applied challenge—for the first time—arguing that any as-applied challenge must necessarily fail because Pennsylvania courts would hold that the statute's authorization for WCOs to "enter upon any land or water" is limited by the Fourth Amendment's proscription against unreasonable searches, and thus any unconstitutional search by a WCO is simply not an application of the statute. *See* Reply Br. 1–3, Doc. 24; *see also id.* at 1 n.1 ("[I]f § 901(a)(7) does not permit unconstitutional conduct, Mr. Moon could not have 'relied on' § 901(a)(7) to engage in any unconstitutional conduct."); *id.* at 2 n.2 ("[I]f § 901(a)(7) does not permit unconstitutional searches, any purportedly unconstitutional searches could not have been conducted 'pursuant to' that statute, and thus Mr. Thomas's as-applied challenge fails along with his facial one.").

We are unpersuaded by this circular argument. *See generally Roberts v. Legacy Meridian Park Hosp., Inc.*, 97 F. Supp. 3d 1245, 1252 (D. Or. 2015) ("The fallacy of 'begging the question' or 'circular argument,' more formally known as the fallacy of *petitio principii* (literally, assuming the initial point), results from assuming in the premises that which is sought to be proven in the conclusion."); Ruggero J. Aldisert, *Logic for Lawyers: A Guide to Clear Legal Thinking* 11-30 to -35 (1992) ("In order

to prove that *A* is true, *B* is used as proof, but since *B* requires support, *C* is used in defense of *B*, but *C* also needs proof and is substantiated by *A*, the proposition which was to be proved in the first place."). The defendants' argument in reply boils down to an empty tautology: Because Section 901(a)(7) does not permit unconstitutional searches, any unconstitutional search by a WCO is not an application of the statute.

The plaintiff alleges that, on two separate occasions, WCO Moon entered onto and searched Mr. Thomas's privately-owned land pursuant to a statutory provision that authorized him to "[e]nter upon any land or water in the performance of [his] duties," without either a warrant or consent of the property owner.[1] *See* 30 Pa. Cons. Stat. Ann. § 901(a)(7). The plaintiff contends that, under the particular circumstances alleged, this conduct deprived him of his Fourth Amendment right to be free from unreasonable searches and seizures. *See Mitchell*, 652 F.3d at 406; *Marcavage*, 609 F.3d at 273.

---

[1] The primary duties of a WCO involve enforcement of state laws concerning fish and watercraft. *See* 30 Pa. Cons. Stat. Ann. § 901(a)(1); *see also* 58 Pa. Code § 51.11(a). WCOs have a reciprocal duty to enforce state game and forestry laws as well. *See* 71 P.S. § 766. WCOs are also authorized to exercise limited police powers with respect to criminal offenses encountered in the performance of their primary duties. *See* 30 Pa. Cons. Stat. Ann. § 901(a)(12), (13); 58 Pa. Code § 51.11–.13.

In considering an as-applied challenge, the issue is not whether WCO Moon's conduct was in accord with state law, whether as written or as might be more narrowly construed by the state courts, but whether his conduct fell outside what a properly drawn statute could cover under the Fourth Amendment. *See Bd. of Tr. State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989) ("The person invoking [an as-applied challenge] asserts that *the acts . . . that are the subject of the litigation* fall outside what a properly drawn prohibition could cover.") (emphasis in original); *Henry v. Cnty. of Shasta*, 132 F.3d 512, 522 (9th Cir. 1997) (citing and quoting *Fox* in the context of an as-applied challenge under the Fourth Amendment). In other words, WCO Moon entered onto and searched Mr. Thomas's property in exercise of his authority under Section 901(a)(7) to so "enter upon any land" in the performance of fish and boat code enforcement duties, and Thomas claims that doing so, without a warrant or consent, was in violation of the Fourth Amendment.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. It is well settled that a search conducted without a warrant

issued upon probable cause is "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted); *see also Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996) ("Warrantless searches are presumptively unreasonable under the Fourth Amendment."). One such exception is when a person voluntarily consents to the search. *See Fernandez v. California*, 571 U.S. 292, 298–99 (2014); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *Bumper v. N. Carolina*, 391 U.S. 543, 548 (1968); *United States v. Parson*, 599 F. Supp. 2d 592, 601–02 (W.D. Pa. 2009).

"Fourth Amendment protections extend not only to a person's home, but also to the curtilage surrounding the property." *Estate of Smith v. Marasco* (*Marasco I*), 318 F.3d 497, 518 (3d Cir. 2003). "A person's curtilage is the area immediately adjacent to his home in which he has a legitimate expectation of privacy." *Estate of Smith v. Marasco* (*Marasco II*), 430 F.3d 140, 156 n.14 (3d Cir. 2005). "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *Collins v. Virginia*, 584

U.S. 586, 592–93 (2018). In some cases, the curtilage may include the

home's backyard, *see California v. Ciraolo*, 476 U.S. 207, 210 (1986), or

portions of the home's driveway, front porch, or side garden. *See Collins*,

584 U.S. at 593–94.

Based on the allegations of the complaint, it is simply beyond cavil

that WCO Moon entered onto the curtilage of the Thomases' home,

without a warrant or consent. The actual physical dimensions of the

curtilage at issue—and the extent of WCO Moon's incursion into that

space—remain unclear, and the basis for declaratory or injunctive relief

is likewise unclear, but we find no difficulty at all in concluding that the

plaintiff has pleaded sufficient facts to state a plausible claim that the

particular conduct of WCO Moon on these two occasions infringed upon

the plaintiff's Fourth Amendment right to be free from unreasonable

searches and seizures.

Accordingly, we will deny the motion to dismiss with respect to the

plaintiff's as-applied challenge to Section 901(a)(7).

## B. The Plaintiff's Facial Challenge to Section 901(a)(7)

As the Supreme Court has recognized, "[a] facial challenge to a

legislative Act is . . . the most difficult challenge to mount successfully,

since the challenger must establish that *no set of circumstances* exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987) (emphasis added); *see also Heffner*, 745 F.3d at 65; *Aichele*, 103 F. Supp. 3d at 688.

It is not difficult to conceive of such circumstances in which a waterways conservation officer might exercise his authority under Section 901(a)(7) without violating the Fourth Amendment. Under the "open fields" doctrine, a waterways conservation officer may enter onto private land in the performance of his or her duties without implicating the Fourth Amendment, so long as he or she refrains from entering onto the curtilage area adjacent to a home. *See generally Hester v. United States*, 265 U.S. 57, 59 (1924) ("[T]he special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law.").

As the Supreme Court has explained, "an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." *Oliver v. United States*, 466 U.S. 170, 178 (1984).

> [T]he common law distinguished "open fields" from the "curtilage," the land immediately surrounding and associated with the house. The distinction implies that only the curtilage, not the neighboring open fields, warrants the Fourth Amendment protections that attach to the home. At common law, the curtilage is the area to which extends the intimate activity associated with the "sanctity of a man's home and the privacies of life," and therefore has been considered part of home itself for Fourth Amendment purposes. Thus, courts have extended Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private. Conversely, the common law implies, as we reaffirm today, that no expectation of privacy legitimately attaches to open fields.

*Id.* at 180 (citations omitted). Moreover, "[i]t is clear . . . that the term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither 'open' nor a 'field' as those terms are used in common speech." *Id.* at 180 n.11.

Setting aside the particular characteristics of the Thomases' property and the particular circumstances of the two incidents in which WCO Moon entered onto and searched their property, the challenged statute clearly could be applied to authorize a waterways conservation officer to enter onto private property that does not constitute curtilage—for example, entry onto commercial or industrial property, *see, e.g.*, *Dow*

*Chem. Co. v. United States*, 476 U.S. 227, 239 (1986) (finding that open areas of large industrial plant complex were not analogous to curtilage of a dwelling); *United States v. McKenzie*, 13 F.4th 223, 232 (2d Cir. 2021) ("When one rents a storage unit, no curtilage comes with it."), or entry onto privately owned farmland to search a field behind a locked gate with a "no trespassing" sign, but more than a mile from the property owner's home, *see, e.g.*, *Oliver*, 466 U.S at 173.[2]

In essence, the plaintiff's facial challenge is that the statute authorizing waterways conservation officers to "enter upon any land or water" to investigate fishing and boating violations is overbroad. But the fact that Section 901(a)(7) "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since [the Supreme Court has] not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." *Salerno*, 481 U.S. at 745; *Mitchell*, 652 F.3d at 415 n.26 ("Outside of the First Amendment,

---

[2] Although the particular characteristics of the plaintiff's property are immaterial to our evaluation of his facial challenge, we note that it is by no means clear that his private dock, situated on Butler Lake about 75 feet from his home, falls within the curtilage of his home. One may readily conceive, however, of other privately owned properties to which this statute might be applied that include portions that are distinctly "open fields" rather than "curtilage."

potential overbreadth does not provide a means for striking down a statute.").[3]

---

[3] In support of this "overbreadth" argument, the plaintiff contends that Section 901(a)(7) of the Fish and Boat Code should be read *in pari materia* with a similar provision of the Game and Wildlife Code.

Section 901(a)(2) of the Game and Wildlife Code authorizes wildlife conservation officers to "[g]o upon any land or water outside of buildings, except curtilage, posted or otherwise, in the performance of the officer's duty." 34 Pa. Cons. Stat. Ann. § 901(a)(2). The plaintiff argues that the inclusion of the term "except curtilage" limits this provision of the Game and Wildlife Code and suggests that the similar Fish and Boat Code provision, which does not contain this phrase, should be read to authorize waterways conservation officers to enter onto the curtilage of homes, rendering the statute unconstitutionally overbroad. We note, however, that the "except curtilage" language was only added to the Game and Wildlife Code provision by an amendment enacted in December 2010. *See* 2010 Pa. Legis. Serv. Act 2010-64 (H.B. 181) § 1 (West) (Oct. 7, 2010) (codified at 34 Pa. Cons. Stat. Ann. § 901(a)(2)). Prior to this amendment, and from the Game and Wildlife Code's original enactment in 1986, this provision authorized wildlife conservation officers to "[g]o upon any land or water outside of buildings, posted or otherwise, in the performance of the officer's duty." Act No. 1986-93, Pub. L. No. 442, § 901(2) (July 8, 1986) (codified as amended at 34 Pa. Cons. Stat. Ann. § 901(a)(2)). Moreover, another, parallel provision of the Game and Wildlife Code similarly authorizes wildlife conservation officers to enter onto private property, but without the "except curtilage" language. *See* 34 Pa. Cons. Stat. Ann. § 303(c) ("Every officer, employee or representative of the [Game Commission] in the exercise of their powers and duties shall have the right and authority to go upon or enter any property, posted or otherwise, outside of buildings."). Between the Game and Wildlife Code's enactment in 1986 and amendment of Section 901(a)(2) in 2010, Pennsylvania state courts held on multiple occasions that the authority granted by this statute was cabined by the requirements of the Fourth Amendment. *See Commonwealth v. Rood*, 686 A.2d 442, 446 (Pa. Commw.

*(continued on next page)*

Ct. 1996) ("Section 901[(a)](2) of the Code permits Wildlife Officers to '[g]o upon any land or water outside of buildings, posted or otherwise, in the performance of the officer's duty.' The Fourth Amendment, however, applies to all duly qualified law enforcement officers, including Wildlife Officers.") (citations omitted); *Commonwealth v. Palm*, 462 A.2d 243, 246–47 (Pa. Super. Ct. 1983) ("A determination of the legality of a stop and search of a vehicle by a lawfully qualified game protector begins with a consideration of the requirements of the Fourth Amendment."); *Commonwealth v. Favere*, 14 Pa. D. & C.4th 401, 403 (Carbon Cnty. (Pa.) Ct. Com. Pl. 1992) ("[T]he Game and Wildlife Code gives Game Commission officers broad powers in conducting searches for violation of laws relating to game and wildlife. . . . The Fourth Amendment provisions against unreasonable searches and seizures limit these broad police powers."); *see also Commonwealth v. Mayhugh*, 75 Pa. D. & C.2d 552, 555 (Somerset Cnty. (Pa.) Ct. Com. Pl. 1975) (holding that, under an earlier game and wildlife law, the authority of a game protector to enter upon private property without consent or a warrant "must be qualified so as to be consistent with the constitutional restrictions against unreasonable searches and seizures"). Indeed, this body of case law appears to have informed the legislature's 2010 amendment, which was apparently enacted with the intent of codifying the existing state of law, rather than modifying it. *See* Pa. H.R. Jour., 2009 Reg. Sess. No. 39 (June 1, 2009) (discussion of H.B. 181) ("I would like to be very clear that this [bill] does not restrict or broaden the powers of wildlife conservation officers. In fact, it merely puts into statute what the current status of case law should already be regarding the legal standards of search and seizure for wildlife conservation officers.") (remarks of Rep. Cutler, bill sponsor).

Meanwhile, the provision of the Fish and Boat Code *sub judice* remains substantially unchanged from its original enactment in 1980. *Compare* 30 Pa. Cons. Stat. Ann. § 901(a)(7) ("Every waterways conservation officer shall have the power and duty to . . . [e]nter upon any land or water in the performance of their duties.") *with* Act No. 1980-175, Pub. L. No. 996, § 901(a)(7) (Oct. 16, 1980) (codified as amended at 30 Pa. Cons. Stat. Ann. § 901(a)(7)) ("Every waterways patrolman shall have the power and duty to . . . [e]nter upon any land or water in the performance

*(continued on next page)*

- 22 -

The plaintiff has submitted a notice of supplemental authority, arguing that a recent decision by the Supreme Court of Pennsylvania supports his position that Section 901(a)(7) is facially unconstitutional. But this recent decision, *Commonwealth v. Hunte*, 337 A.3d 483 (Pa. 2025), is inapposite. While *Hunte* involved a facial challenge to a statute under the Fourth Amendment, and the Supreme Court of Pennsylvania concluded that the statute was indeed facially unconstitutional, the statute at issue in *Hunte* mandated that emergency room medical providers take blood samples from persons suspected of driving under the influence of alcohol or controlled substances and transmit them for laboratory testing, without a warrant, consent, or a showing of exigent circumstances. *See* 75 Pa. Cons. Stat. Ann. § 3755(a); *Hunte*, 337 A.3d at 488, 517. It is well established that the Fourth Amendment is implicated when a search involves an intrusion into the human body, such as the

---

of their duties."). While not the subject of much litigation, a state court has recently had occasion to consider the scope of authority granted to waterways conservation officers under Section 901(a)(7). While finding no unreasonable search or seizure occurred under the facts presented, that court expressly considered the statutory authority exercised by a waterways conservation officer in that case in the context of limitations imposed by the Fourth Amendment. *See Commonwealth v. Karash*, 309 A.3d 1159, 1171–72 (Pa. Commw. Ct. 2024).

compulsory taking of blood sample for laboratory testing, and thus a warrant is ordinarily required to do so. *See Schmerber v. California*, 384 U.S. 757, 767–71 (1966); *see also Missouri v. McNeely*, 569 U.S. 141 (2013). Unlike a waterways conservation officer's entry onto private lands, which may involve a search of unprotected open fields rather than curtilage, the nonconsensual warrantless blood draw and testing mandated by the statute in *Hunte* could never pass constitutional muster under any set of circumstances, and thus it was facially unconstitutional. *See Hunte*, 337 A.3d at 517–18.

Accordingly, we will grant the motion to dismiss with respect to the plaintiff's facial challenge to Section 901(a)(7).

## C. Leave to Amend

The Third Circuit has instructed that if a civil rights complaint is vulnerable to dismissal for failure to state a claim, the district court must permit a curative amendment, unless an amendment would be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). This instruction applies equally to *pro se* plaintiffs and those represented by counsel. *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004). In this case, based on the pleadings and motion papers before the

court, it is clear that any amendment would be futile with respect to the plaintiff's § 1983 Fourth Amendment claim asserting a facial challenge to 30 Pa. Cons. Stat. Ann. § 901(a)(7). Thus, the plaintiff's facial challenge will be dismissed *without* leave to amend.

## IV. CONCLUSION

For the foregoing reasons, the motion to dismiss will be granted in part and denied in part. The plaintiff's facial challenge to the statute will be dismissed, and the defendants will be directed to answer the complaint.

An appropriate order follows.

Dated: September 5, 2025          *s/Joseph F. Saporito, Jr.*
                                  JOSEPH F. SAPORITO, JR.
                                  United States District Judge